IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

TYNESHA S. BRADEN                )
                                 )
v.                               )    No. 1:07-0009
                                 )    Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION   )


To:  The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§
405(g) and 1383(c)(3), to obtain judicial review of the final
decision of the Social Security Administration ("SSA" or "the
Administration"), through its Commissioner, denying plaintiff's
application for supplemental security income ("SSI") benefits, as
provided under Title XVI of the Social Security Act ("the Act").
The case is currently pending on plaintiff's motion for judgment
on the administrative record (Docket Entry No. 17), to which
defendant has responded (Docket Entry No. 19).  Plaintiff has
further filed a reply brief in support of her motion (Docket
Entry No. 20).  Upon consideration of these papers and the
transcript of the administrative record (Docket Entry No. 12),
and for the reasons given below, the undersigned recommends that
plaintiff's motion be **DENIED**, and that the decision of the SSA be
**AFFIRMED**.

1

# I. Introduction

Plaintiff filed her SSI application on June 26, 2001, alleging disability due to back pain, the residuals from broken hips and a broken pelvis, and an anxiety disorder (Tr. 66-68, 75). Plaintiff's application was denied at both the initial and reconsideration stages of review by the designated state agency component of the Administration (Tr. 45-48, 51-52), whereupon plaintiff requested that her case be forwarded to the SSA's Office of Hearings and Appeals for hearing before an Administrative Law Judge ("ALJ"). (Tr. 53) The ALJ heard the case on June 21, 2004, receiving testimony from plaintiff, plaintiff's mother, and an impartial vocational expert (Tr. 418-54). After these witnesses were examined by the ALJ and by plaintiff's representative, the case was taken under advisement until September 9, 2004, when the ALJ issued a written decision denying plaintiff's claim to SSI entitlement. That decision (Tr. 16-26) contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant's status post fractures of lower limb, fractures of bones, and anxiety disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for

2

the reasons set forth in the body of the decision.

5.   The claimant retains the residual functional capacity
     to perform the exertional demands of light work with a
     sit/stand option not requiring a significant amount of
     memory or concentration.

6.   The claimant has no past relevant work (20 CFR §
     416.965).

7.   The claimant is a 'younger individual' (20 CFR §
     416.963).

8.   The claimant has 'a limited education' (20 CFR §
     416.964).

9.   The claimant has the residual functional capacity to
     perform a significant range of light work (20 CFR §
     416.967).

10.  Although the claimant's exertional limitations do not
     allow her to perform the full range of light work,
     using Medical-Vocational Rule 202.17 as a framework for
     decision-making, there are a significant number of jobs
     in the national economy that she could perform.
     Examples of such jobs include work as a small product
     packer, general clerk, marker, storage attendant, and
     table worker.

11.  The claimant was not under a "disability," as defined
     in the Social Security Act, at any time through the
     date of this decision (20 CFR § 416.920(g)).

(Tr. 25)

         On October 23, 2006, the SSA's Appeals Council denied

plaintiff's request for review of the ALJ's decision (Tr. 6-8),

thereby rendering that decision the final decision of the

Administration.  This civil action was thereafter timely filed,

and the court has jurisdiction.  42 U.S.C. §§ 405(g), 1383(c)(3).

If the ALJ's findings are supported by substantial evidence,

based on the record as a whole, then those findings are

3

conclusive.  Id.


## II.  Review of the Record

On September 20, 1997, the day before her eighteenth birthday, plaintiff was involved in a motor vehicle accident resulting in horrific injuries which she was fortunate to survive.  She was transported from the scene of the accident to Vanderbilt Hospital

> by Life Flight hypotensive, resuscitated in the
> emergency department ... Bedside DPL was grossly
> bloody.  She was emergently taken to the operating room
> where an exploratory celiotomy was done and showed a
> lacerated spleen.  A splenectomy was done.  She also
> had 1.5 liters out of her chest tube.  CT surgery was
> called.  Left thoracotomy was done and the patient had
> pulmonary laceration to the left lower lobe for which a
> wedge resection was done ... Post injury day #3 the
> patient was taken back to the OR for closure of the
> abdominal wall without complications.  On post injury
> #9 the patient went back to the OR per orthopedics to
> have percutaneous screw fixation of her left sacroiliac
> joint ... Post injury day #12 the patient went back to
> the OR with orthopedics to have pelvic external fixator
> application....

(Tr. 328)  Plaintiff also suffered multiple rib fractures as a result of the accident, in addition to her other bone fractures and significant internal injuries (Tr. 406).

Plaintiff remained in the Intensive Care Unit for more than a month following the accident and resulting multiple surgeries.  Due to the magnitude of her injuries, plaintiff's recovery was slow, with additional delay due to a "dystonic reaction to the Haldol" administered to control her agitation on

4

the ventilator (Tr. 328).  Plaintiff was eventually able to be
weaned from the ventilator, and was thereafter transferred to
Stallworth Rehabilitation Hospital to begin inpatient
rehabilitation on October 29, 1997.

The course of plaintiff's rehabilitation was marked by
slow but steady progress.  External screws were removed from her
pelvis in mid-November of 1997 (Tr. 324).  In late December of
1997, Dr. Daniel Cullinane, who had performed plaintiff's
abdominal surgeries including her splenectomy, followed up with
plaintiff and observed that she was recovering well physically,
but had some complaints of anxiety attacks that may represent a
posttraumatic stress disorder (Tr. 321).  Dr. John R. Edwards,
plaintiff's orthopedic surgeon, advised plaintiff that a
psychiatrist would need to be consulted if these attacks
increased in intensity or frequency.  Id.

By mid-January of 1998, plaintiff was able to walk
slowly (Tr. 320).  Dr. Edwards noted in late March of 1998, about
six months after the accident, that she had an excellent range of
motion in her lower limbs, apparently indicating a recovery from
the hip surgery he had performed (Tr. 319).  Dr. Edwards
expressed the opinion that plaintiff had healed and rehabilitated
her orthopedic injuries to the point that she could "discontinue
all assist[ive] devices and seek gainful employment should she so
desire."  Id.  Though Dr. Edwards preferred to follow up with one

5

more radiograph of plaintiff's pelvis in six months' time, it appears that plaintiff declined this recommendation and had no further contact with her Vanderbilt physicians after March of 1998.

On June 30, 1999, plaintiff was admitted to Maury Regional Hospital from its emergency department, during the 34th week of her pregnancy, for evaluation of acute onset of severe chest pain radiating through the chest, neck, and arm (Tr. 114-24). She denied weakness or parasthesias, but complained of occasional mood swings with anxiety. Id. Plaintiff appeared to one consulting physician to be in moderate distress and to be experiencing pain (Tr. 123). Plaintiff was noted to have suffered an acute onset of chest pain, tachypnea, and borderline hypoxemia with an abnormal EKG, as well as an acute anxiety attack; she was also felt to have early pneumonia. Id. A drug screen was positive for opiates and marijuana (Tr. 119). After a three-day stay in the hospital, "the consensus of opinion from all specialists consulted was that she [was] having noncardiac chest pain, musculoskeletal in origin secondary to her previous history of extensive chest trauma and partial lobectomy." (Tr. 114) By July 3, 1999, plaintiff's symptoms were improved and she was discharged from the hospital with prescriptions for Tylenol No. 3 and prenatal vitamins. Id.

On August 10, 1999, plaintiff was admitted to the

6

hospital for delivery of her child by Cesarean section, without complication. She was discharged on August 13, 1999. (Tr. 125-27)

Maury Regional Healthcare's outpatient clinic treated plaintiff's complaints of the onset of low back pain in November of 2000 (Tr. 207-09). Examination revealed that she was tender over both sacroiliac joints, had a positive result on straight leg raise testing on the left, and was unable to assume an upright position (Tr. 207). Plaintiff was prescribed Naprosyn and thirty capsules of the narcotic Lortab for her pain. On December 13, 2000, plaintiff was seen at the clinic with multiple symptoms, and was assessed with sinusitis and chronic back pain (Tr. 204). She requested Lortab first for her chest pain, which the physician denied, and then for her low back pain, which was also denied, in light of plaintiff's failure to obtain the CT scan of her back that was ordered for further evaluation of her pain. Id. Plaintiff then asked the clinic physician if she could obtain Lortab at the emergency room, to which the physician responded that it would depend on the individual provider. Id.

In January 2001, plaintiff was treated for abdominal and urinary complaints at the Maury Regional emergency room, and then at the clinic, receiving treatment with Lortab and antibiotics for her pain and infection (Tr. 131-38, 194-97, 201-03). In May and June of 2001, plaintiff received treatment for

7

abdominal, vaginal, and urinary tract symptoms; a mammogram
ordered in response to plaintiff's complaints of swelling in her
left breast returned negative results. (Tr. 129-30, 181-86, 187)

On September 6, 2001, plaintiff was consultatively
examined at government expense by Dr. Shawn Reed (Tr. 144-46).
Dr. Reed summarized the impact of the motor vehicle accident by
noting that plaintiff

had a lot of broken bones including two hips, six ribs,
crushed pelvis, two to three vertebrae in her back ...
Her spleen was removed. A fourth of her lung was
removed.

(Tr. 144) He further noted a history of anxiety attacks and
depression (Tr. 145). Dr. Reed's impression was that plaintiff
did have "some residual pain in her neck, back, and hips, but
[had a] very normal exam today." Id. He concluded that
plaintiff could "do light duty specifically working one-third to
two-thirds of the day with frequent breaks and lifting no more
than 20 pounds." Id.

Plaintiff was also sent for a consultative
psychological examination at government expense, on April 3,
2002, conducted by Dr. Deborah Doineau, Ed.D. (Tr. 218-21) Dr.
Doineau reported that plaintiff's response to questioning was
very vague or general, and that while she did not believe that
plaintiff was purposefully attempting to misrepresent her
condition, there was some degree of evasiveness in her responses
(Tr. 218). Plaintiff complained of frequent pain and anxiety

8

attacks, for which she declined to take medication (Tr. 219).
Plaintiff reported no history of alcohol or drug abuse, and no
history of involvement with the criminal justice system.  Id.
Plaintiff's description of symptoms indicated difficulties
approximately every other week with episodes of shortness of
breath, nervousness, racing heart, sweating, and fearfulness,
with nothing in particular precipitating these episodes, which
resulted in the feeling of a need to sleep (Tr. 220).  Plaintiff
reported that she was able to go places alone, and was the
primary caretaker of her son, whom she was able to feed, dress,
and play with.  Id.  Plaintiff further reported activities
including washing dishes, cleaning her room and the bathroom,
babysitting, preparing meals including baked foods for her son's
dinner, and engaging socially with friends that would
occasionally come to her home, as well as occasionally going out
with those and friends or going out to eat with her boyfriend
(Tr. 220-21).  She reported the ability to keep up with, and
driver herself to, her appointments, though she did receive
assistance from her mother in making decisions (Tr. 221).  Dr.
Doineau's assessment of plaintiff's functional abilities included
findings of her capability to interact appropriately with others,
understand instructions, maintain hygiene, use public
transportation, adapt to changes, and to concentrate, remember or
persist without significant limitation; her diagnoses were panic

9

disorder without agoraphobia and dysthymic disorder, as well as possible somatization tendencies and possible dependent personality disorder traits.  Id.

File reviews by the nonexamining consultants at the state agency level of review resulted in assessments of only mild limitations in the ability to maintain concentration, persistence or pace (Tr. 232, 234), along with physical limitation to the exertional demands of medium work (Tr. 236).

On October 13, 2003, plaintiff presented to Centerstone Community Mental Health Center, where her intake assessment included a report that plaintiff felt anxious 3-4 times per week, with dreams, flashbacks and recurrent thoughts of her 1997 automobile accident, as well as an inability to sleep, disrupted appetite, depressed mood, crying spells, difficulty leaving her home, difficulty interacting with people, poor memory, decreased concentration, and racing thoughts (Tr. 303).  She also complained of chronic back, neck, and hip pain since her accident (Tr. 300, 302).  It was noted that plaintiff smoked marijuana every Saturday, but was currently not taking any medications (Tr. 303).  Her mood was depressed and she had an anxious affect, and therapy was scheduled for October 27, 2003, with a psychiatric evaluation to be conducted on November 17, 2003 (Tr. 304).

On October 27, 2003, plaintiff's therapist noted her anxious affect and sad/anxious mood (Tr. 310).  The therapist

thought that plaintiff had marked difficulties with interpersonal functioning and adaptation to change, and moderate restrictions in her daily activities, with a fairly limited ability to sustain concentration (Tr. 309). It was further noted that plaintiff was very nervous about the possibility of taking medication. Id. The therapist had to cancel plaintiff's next therapy appointment, and plaintiff did not keep her initial psychiatric appointment in November, nor her therapy appointment in December of 2003 (Tr. 306-07, 317-18). Subsequently, plaintiff's care at Centerstone was reported terminated on February 2, 2004. The summary of care stated that plaintiff had reported symptoms of anxiety, was diagnosed with posttraumatic stress disorder and cannabis abuse, and was assigned a Global Assessment of Functioning ("GAF") score indicating moderate psychological limitations (Tr. 297-98).

Plaintiff returned to Centerstone on June 2, 2004, reporting symptoms of depression, memory loss, and chronic pain (Tr. 280-90). The impetus for plaintiff's return to mental health care was apparently her realization that she needed counseling and perhaps medication in order to provide a normal environment for her young son, whom plaintiff reportedly kept home all the time due to her own compulsion toward social isolation. (Tr. 284, 441) Plaintiff was noted at her intake evaluation to be extremely tearful, and to seem mildly irritated (Tr. 284). She did not keep her appointment for therapy the

11

following day (Tr. 313-14). However, on June 11, 2004, plaintiff was seen for an initial psychiatric evaluation by Dr. William J. Vanveen (Tr. 278-96). Dr. Vanveen noted that plaintiff had a difficult time being specific and stated that she depended on her mother for everything (Tr. 279). He diagnosed major depressive disorder with psychotic features and cannabis abuse, and further assessed a current GAF score indicating major impairment of functioning (Tr. 294). Plaintiff was prescribed the antidepressant Zoloft, but stopped taking it after a few doses because it made her feel strange and took away her appetite (Tr. 275, 277). Dr. Vanveen concluded that there was "[s]omething definitely hysterical about her description and beliefs about her body and physical functioning, and [she] gives herself continuous negative feedback about herself (needs Behavioral [treatment])." (Tr. 292) Plaintiff was subsequently noted by her therapist to have poor interpersonal functioning because she "isolates," and to have a poor ability to adapt to change because her depressive symptoms worsen with stress and she has difficulty coping with her chronic pain (Tr. 274).

At her hearing before the ALJ, plaintiff and her mother testified that the accident had significantly impacted plaintiff's ability to function. Plaintiff's mother testified that her daughter was "full of life" before the accident (Tr. 445), but since her recovery and rehabilitation

12

> [s]he's always sad.  She's always depressed.  She is
> always in pain.  She has panic attacks and anxiety.
> She said to me that she wished she had died. . . . She
> don't remember anything, which is good, what she went
> through, . . . but she's got a real bad anxiety and
> depression problem and lots of pain all the time . . .

(Tr. 445)  Plaintiff testified that she had had goals for her

life before the accident, but now she mostly stays at home

because of the pain and psychological impact of the accident (Tr.

424, 430, 433, 440).


## III.  Conclusions of Law

### A.  Standard of Review

This court reviews the final decision of the SSA to

determine whether that agency's findings of fact are supported by

substantial evidence in the record and whether the correct legal

standards were applied.  Elam ex rel. Golay v. Comm'r of Soc.

Sec., 348 F.3d 124, 125 (6th Cir. 2003).  "Substantial evidence

is defined as 'more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'"  Rogers v.

Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting

Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th

Cir. 1994)).  Even if the evidence could also support a different

conclusion, the SSA's decision must stand if substantial evidence

supports the conclusion reached.  Her v. Comm'r of Soc. Sec., 203

F.3d 388, 389 (6th Cir. 1999).

B.  <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  <u>Id.</u> at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience

14

and residual functional capacity must be considered to
determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir.

2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640,

642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f).

   The SSA's burden at the fifth step of the evaluation

process can be carried by relying on the medical-vocational

guidelines, otherwise known as "the grids," but only if the

claimant is not significantly limited by a nonexertional

impairment, and then only when the claimant's characteristics

identically match the characteristics of the applicable grid

rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir.

2003). Otherwise, the grids cannot be used to direct a

conclusion, but only as a guide to the disability determination.

Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir.

1990). In such cases where the grids do not direct a conclusion

as to the claimant's disability, the SSA must rebut the

claimant's prima facie case by coming forward with proof of the

claimant's individual vocational qualifications to perform

specific jobs, which is typically obtained through vocational

expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting

Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see

also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779

15

(6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  <u>See</u> 42 U.S.C. §§ 423(d)(2)(B), (5)(B); <u>Foster v. Bowen</u>, 853 F.2d 483, 490 (6th Cir. 1988).

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges three errors in the ALJ's decision requiring reversal of that decision and remand for further proceedings:

> (a)  The Administrative Law Judge erred in concluding, based primarily on the report of the examining consultant Dr. Reed, that Tynesha Braden could perform light work;
>
> (b)  The Administrative Law Judge erred in failing to give proper consideration to the extent of plaintiff's mental health impairments; and
>
> (c)  The Administrative Law Judge erred in concluding that there are no limitations in the plaintiff's daily activities or social functioning.

(Docket Entry No. 18 at 10-11)

Regarding plaintiff's first argument, there does not appear to be any dispute that Dr. Reed's assessment of light duty work capability "one-third to two-thirds of the day with frequent breaks" is inconsistent with the 8-hours-per-day, 5-days-per-week

16

requirements of "substantial gainful activity."  While plaintiff
argues that the ALJ failed to appreciate this inconsistency when
he made Dr. Reed's assessment "the primary evidentiary pillar"
for his finding of plaintiff's RFC and "fatal[ly]
micharacteriz[ed]" the assessment as a conclusion that plaintiff
"could perform light duty work" (Docket Entry No. 18 at 12-13),
the undersigned must concur with defendant in finding that it is
plaintiff who misunderstands the weight which was assigned to Dr.
Reed's assessment.[1]

    As plaintiff points out, this record contains three
assessments of her ability to engage in work-related physical
exertion:  Dr. Reed's assessment (Tr. 144-46), the October 2001
assessment of a nonexamining state agency consultant (Tr. 148-
49), and the May 2002 assessment of a second nonexamining state
agency consultant (Tr. 236-37).  Dr. Reed's impression and
recommendation with respect to plaintiff's capacity for physical
exertion were as follows:

        This is a 21-year-old black female who is status post
        multiple fractures including hips, ribs, pelvis and
        vertebrae after a motor vehicle accident with some
        residual pain in her neck, back and hips, but very
        normal exam today. . . . I think at this point she
        would be appropriate to do light duty specifically
        working one-third to two-thirds of the day with

------

[1]In her reply brief, plaintiff states that "it is agreed that the
reliance upon Dr. Reed's report was misplaced."  (Docket Entry No. 20 at 5)
However, no such agreement is apparent to the undersigned.  As further
explained below, the ALJ properly relied on the report of Dr. Reed as evidence
of plaintiff's limitation on maximum lifting.

17

frequent breaks and lifting no more than 20 pounds.

(Tr. 145)  Both consultants to the state agency essentially opined that plaintiff's limitations on lifting, standing, and sitting were such that she would meet the regulatory requirements of medium work, 20 C.F.R. § 416.967(c).  Both consultants opined that plaintiff's ability to lift was reduced as indicated because of the pain she experiences, though neither opined that plaintiff's pain required that she be allowed to alternate between sitting and standing in order to maintain satisfactory comfort (Tr. 149, 237).

In reaching his finding of plaintiff's exertional RFC for light work with a sit/stand option, the ALJ concluded that plaintiff was limited to lifting "no more than 20 pounds at a time[.]"  20 C.F.R. § 416.967(b).  In so doing, he explicitly discounts the less restrictive assessments of the state agency consultants and "gives more weight to the assessment of Dr. Reed who performed a consultative examination of the claimant."  (Tr. 23)  This weighing of the competing assessments is entirely consistent with the regulations, 20 C.F.R. § 416.927(d)(1), and appears to have driven the finding that Dr. Reed's assessment of plaintiff's ability to lift be accepted over those of the other consultants.  Beyond that, there is no indication from the ALJ's decision that he was inclined to adopt Dr. Reed's assessment wholesale, or give it or any portion of it *controlling* weight.

18

Indeed, it is clear to the undersigned that the ALJ merely assigned *more* weight to Dr. Reed's opinion than to the opinions of the nonexamining consultants. He thus resolved the conflict between the lifting limitations which they assessed on his way to fashioning from all the evidence before him an RFC finding consistent with a level of pain that -- as he witnessed at the hearing (Tr. 448) -- required plaintiff to change positions periodically, while allowing her to cumulatively sit, stand, and lift enough to allow for a reduced range of light work.

The ALJ simply did not, as plaintiff's brief suggests, mistake Dr. Reed's conclusion that plaintiff could perform "light duty work" with durational limitations for a conclusion that plaintiff could perform "light work," as defined in the regulations, on a regular and continuing basis. Because he did not so mischaracterize Dr. Reed's conclusion in his "brief[] summar[y]" of the evidence (Tr. 22), and since in any event he did not adopt any such actual or imagined conclusion of Dr. Reed as his own, the ALJ committed no error. The undersigned finds plaintiff's contrary argument to be without merit.

With regard to plaintiff's second and third arguments -- that the ALJ did not properly consider the extent of her mental impairments as reflected in the records of her providers at Centerstone and the testimony presented at the hearing, but improperly discounted that evidence as primarily focused on

19

plaintiff's complaints/symptoms (Tr. 22); and that the ALJ
improperly found no limitations in the plaintiff's daily
activities or social functioning -- the undersigned finds no
error.  There is no doubt that psychological or psychiatric
treatment is, of necessity, largely rendered in response to the
patient's subjective report of symptoms, and that this fact alone
will not allow the wholesale dismissal of such mental health
evidence that does not also include results of standardized tests
or other objective measurements of function.  See Walker v. Sec'y
of Health & Human Servs., 980 F.2d 1066, 1071 n.3 (6ᵗʰ Cir.
1992).  However, while the ALJ here twice noted the focus on
plaintiff's alleged symptoms in Centerstone's records, this was
not the sole reason for his finding that plaintiff's mental
impairments manifested only restrictions against significant
concentration or memory, with no restrictions on daily activities
or social functioning.  Rather, it is clear that this devaluation
of reports of plaintiff's more limiting symptoms was driven by
the ALJ's finding that plaintiff was not a credible witness.

    As recognized by the Sixth Circuit, an ALJ may properly
consider the claimant's credibility when analyzing that
individual's level of impairment from subjective symptoms, and
great deference is owed to such determinations of credibility.
Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 392 (6ᵗʰ Cir. 2004).
"The claimant's credibility may be properly discounted 'to a

certain degree . . . where an [administrative law judge] finds contradictions among the medical reports, claimant's testimony, and other evidence.'"  Id. (quoting Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997)).  In the case at bar, the ALJ made note of the following items leading up to his determination that plaintiff's subjective complaints were not entirely credible:

> . . . According to information the claimant provided, she goes to the store and mall, drives, prepares meals for herself and her son, does household chores when she is feeling good, and is the primary caretaker of her son (Exhibit 2E). . . .

> . . . The claimant stated that she gets along okay with others, she has a boyfriend and one friend, she visits with friends and relatives, and goes out to eat with her boyfriend (Exhibits 2E, 7F). . . .

> * * *

> As previously mentioned, the claimant had a psychological evaluation in April 2002.  Dr. Doineau noted that the claimant drove herself to and from the assessment site in her vehicle.  Dr. Doineau also noted that the claimant tended to respond to questions with very vague or general answers, making it difficult to better understand her condition and symptoms.  Although she did not purposefully attempt to misrepresent her condition, there was question as to purposeful evasiveness when responding to questions.  The claimant reported that she had been to the mental health clinic following her motor vehicle accident and saw a counselor several times, but dropped out of treatment. She had never been admitted to a psychiatric hospital, been to the emergency room in conjunction with panic attacks, and has never attempted suicide.  She denied a history of drug or alcohol abuse, or trouble with the Criminal Justice System. . . .

21

* * *

. . . The claimant testified that she does not clean house, does not make her bed, and does not cook and has not been able to cook since the accident. She said that her mother cooks for her or she eats fast food. However, she drives her son to day care, and stops by the store every week or so.

. . . According to the claimant, she saw a counselor several times following her accident, but dropped out of treatment. More recently, she has been seen at Centerstone; however, their records primarily document the claimant's alleged symptoms. According to an evaluation by a psychologist in April 2002, the claimant was oriented, her memory seemed grossly intact, and she did not appear to have significant impairment in her ability to concentrate, remember or persist. During the evaluation, the claimant reported that she takes care of her son during the day; she also reported that she washes dishes, straightens her room, cleans the bathroom and prepares meals. However, the undersigned notes that the claimant testified otherwise.

The undersigned also notes that the claimant admits to using marijuana and has tested positive for same, as well as opiates; she also has had some legal problems although she has denied such problems.

The claimant also testified that she has problems with her hands. However, the hospital records following her motor vehicle accident [do] not mention any injuries to her upper extremities whatsoever, and there is no other reported medical evidence in the record that the claimant has any problems in using her hands. The claimant testified that she experiences shortness of breath, but there is nothing in the record that mentions any problems with difficulty in breathing.

(Tr. 18, 21, 22, 23)

On a record such as this, where there are "demonstrable

22

discrepancies" between, on one hand, what plaintiff said on the stand and in clinical interviews upon becoming motivated to pursue treatment, and on the other hand, what plaintiff reported elsewhere in the record to both her own caregivers and the government consultants, the court should be "particularly reluctant" to set aside the ALJ's credibility finding. <u>Gooch v. Sec'y of Health & Human Servs.</u>, 833 F.2d 589, 592 (6th Cir. 1987).[2] Accordingly, the undersigned must conclude that, despite the presence in the record of some countervailing evidence regarding the effects of plaintiff's untreated anxiety (e.g., Tr. 278)[3], the ALJ's decision is supported by substantial evidence and deserving of affirmance.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **DENIED**, and that the decision of the SSA

---

[2]The undersigned would note that this reluctance is further advisable here in light of the fact that plaintiff's testimony at the hearing was particularly unilluminating, if not purposefully evasive à la the suspected tenor of her responses to the consultative psychological examiner.

[3]Even this report from plaintiff's intake interview at Centerstone some three weeks prior to the ALJ hearing contains, <i>inter alia</i>, the interviewer's notations that "[Client] reports she does not have any support, despite being brought to the evaluation by her mother today.  [Client] reports she just sits around all day doing nothing. . . . She has a difficult time being specific about what she means[,] finally says she depend[s] on her mother for 'everything, appointments, whether we're eating alright, everything'" (Tr. 278-79).

23

be **AFFIRMED**.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 7th day of October, 2008.

<u> s/ John S. Bryant            </u>
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE