# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

TYNESHA S. BRADEN,                          )
                                            )
    **Plaintiff,**                              )
                                            )    **No. 1:07-cv-00009**
**v.**                                      )
                                            )    **Judge Nixon**
CAROLYN COLVIN,                             )    **Magistrate Judge Bryant**
**Commissioner of Social Security,**        )
                                            )
    **Defendant.**                              )

## ORDER

Pending before the Court is Plaintiff Tynesha S. Braden's Motion for Judgment on the

Administrative Record ("Motion") (Doc. No. 17), filed with a Memorandum in Support (Doc.

No. 18.) Defendant Commissioner of Social Security ("Commissioner") filed a Response in

Opposition (Doc. No. 19), to which Plaintiff filed a Reply, (Doc. No. 20). Magistrate Judge

Bryant issued a Report and Recommendation ("Report"), recommending that Plaintiff's Motion

be denied and the decision of the SSA be affirmed. (Doc. No. 21 at 23–24.) Plaintiff then filed

an Objection to the Report. (Doc. No. 27.) For the reasons stated below, the Court **ADOPTS**

the Report in its entirety and **DENIES** Plaintiff's Motion.

## I.   FACTUAL BACKGROUND

Plaintiff filed an Application for Supplemental Security Income ("SSI") on June 26,

2001, alleging disability due to injuries from a 1997 car accident. (Tr. 75.) Specifically, she

claims that back pain, leg pain, anxiety attacks, and injuries associated with her broken hips,

broken ribs, crushed pelvis, and removal of a portion of her lung limit her ability to work. (*Id.*)

*A. 1997 Car Accident and Resulting Hospitalization and Injuries*

Plaintiff was seriously injured in a car accident on September 20, 1997. (Tr. 402–07.) Plaintiff was hospitalized in the Intensive Care Unit at Vanderbilt Hospital for over a month following the accident, having sustained multiple bone fractures and severe internal injuries. (Tr. 327–408.) Plaintiff was placed on a ventilator and several surgeries were performed, including a splenectomy, repair to her lungs, and insertion of metal screws into her pelvis (?). (Tr. 328.) Plaintiff's recovery was slow, but in mid-October, doctors were able to wean her off of the ventilator. (Tr. 334.) Finally, on October 29, 1997, she was transferred to Stallworth Rehabilitation Hospital for inpatient rehabilitation. (Tr. 327–29.)

During rehabilitation, Plaintiff continued to slowly improve. In mid-November 1997, doctors removed the external screws from her pelvis. (Tr. 324–25.) Dr. Daniel Cullinane remarked in late December 1997 that Plaintiff was recovering well, but complained of anxiety attacks, possibly indicating post-traumatic stress disorder. (Tr. 321.) He advised Plaintiff that if her attacks increased in intensity or frequency, she should consult a psychiatrist. (*Id.*)

By mid-January 1998, Plaintiff was able to walk very slowly (Tr. 320), and on March 26, 1998, six months after the accident, Dr. John R. Edwards of Vanderbilt Hospital noted that Plaintiff had "excellent range of motion of both hips," and indicated his belief that she could "discontinue all assist[ive] devices and seek gainful employment should she so desire." (Tr. 319). Although Dr. Edwards recommended that Plaintiff follow up with him in six months, the record contains no further contact between Plaintiff and Vanderbilt Hospital. (*Id.*)

*B. 1999–2001 Treatment at Maury Regional Hospital and Ambulatory Care Center for Pain, Psychological Symptoms, and Infections*

On June 30, 1999, while pregnant, Plaintiff was admitted to Maury Regional Hospital ("Maury") with acute onsets of severe chest pain. (Tr. 114–24.) Plaintiff complained of occasional mood swings with anxiety, and a tested positive for opiates and marijuana on a drug screen. (Tr. 119, 122.) After three days in the hospital, "the consensus of opinion from all specialists consulted was that she [was] having noncardiac chest pain, musculoskeletal in origin secondary to her previous history of extensive chest trauma and partial lobectomy," and Plaintiff was discharged with prescriptions for Tylenol No. 3 and prenatal vitamins. (Tr. 114.)

On August 10, 1999, Plaintiff was admitted to Maury for delivery of her child by Cesarean section, without complication. (Tr. 125–27.)

On November 27, 2000, Plaintiff was admitted to the Columbia, TN Ambulatory Care Center ("ACC"), complaining of back pain. (Tr. 207–09.) The ACC attending physician, a Dr. Conner, noted that she was tender over both sacroiliac joints, had a positive straight leg raise on her left leg, and was unable to assume the upright position. (Tr. 207.) She was given Naprosyn and thirty capsules of the narcotic Lortab for pain. (*Id.*)

On December 13, 2000, Plaintiff returned to the ACC, and was assessed with sinusitis and chronic back pain. (Tr. 204.) Dr. Conner denied her request for additional Lortab due to her failure to obtain a CT scan needed to evaluate her back pain. (*Id.*)

Plaintiff was also treated for abdominal, vaginal, and urinary complaints in January 2001 (Tr. 131–38; 194–97; 201–03), and in May and June 2001, during which she was prescribed Lortab and antibiotics, and completed a mammogram, which returned negative results. (Tr. 129–30; 181–87.)

3

## C. Consultations with SSA Experts

On September 6, 2001, after Plaintiff filed her SSI application, Dr. Shawn L. Reed performed a consultative examination on Plaintiff. (Tr. 144–46.) In regard to her motor vehicle accident, Dr. Reed noted that Plaintiff "had a lot of broken bones including two hips, six ribs, crushed pelvis, two to three vertebrae in her back," and further noted a history of anxiety attacks and depression. (Tr. 144–45.) He concluded that Plaintiff had "some residual pain in her neck, back, and hips, but [had a] very normal exam today," and recommended that Plaintiff could "do light duty specifically working one-third to two-thirds of the day with frequent breaks and lifting no more than 20 pounds." (Tr. 145.)

In October 2001 and May 2002, two non-examining consulting physicians reviewed Plaintiff's file at the state agency level of review. (Tr. 147–52,235–42.) Both physicians concluded that Plaintiff retained the residual functional capacity to perform the exertional demands of medium work.[1] (Tr. 148, 236.) In April 2002, a psychiatric review assessed Plaintiff to have only mild limitations in her ability to maintain concentration, persistence, and pace. (Tr. 232, 234.)

Dr. Deborah Doineau performed a consultative psychological examination of Plaintiff on April 3, 2002. (Tr. 218–21.) Dr. Doineau noted that Plaintiff's responses were sometimes vague and evasive, but that she did not believe Plaintiff was purposefully attempting to misrepresent her condition. (Tr. 218.) She noted Plaintiff's complaints of frequent pain, sleep disturbances, and anxiety attacks, and that Plaintiff had no history of alcohol or drug abuse, or involvement with the criminal justice system. (Tr. 219.) Regarding daily activities, Dr. Doineau indicated

---

[1] 20 C.F.R. 404.1567(c) (2014) defines "medium work" as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."

that Plaintiff feeds, dresses, and plays with her son; washes dishes; cleans her room and the bathroom; prepares meals; engages socially with friends; goes out to eat with her boyfriend; and drives herself to appointments, but does receive some assistance from her mother in making decisions. (Tr. 220–21.) Dr. Doineau concluded that Plaintiff was able to interact appropriately with others, understand instructions, maintain hygiene, use public transportation, adapt to changes, and to concentrate, remember or persist without significant limitation, and diagnosed Plaintiff with panic disorder without agoraphobia, dysthymic disorder, possible somatization tendencies, and possible dependent personality disorder traits. (Tr. 221)

*D. 2003-2004 Psychiatric Treatment at Centerstone Community Mental Health Center*

Plaintiff began treatment at Centerstone Community Mental Health Center ("Centerstone") on October 13, 2003, reporting at her intake assessment that she felt anxious three to four times per week and suffered flashbacks to her 1997 automobile accident, along with an inability to sleep, disrupted appetite, depressed mood, crying spells, difficulty leaving her home, difficulty interacting with people, poor memory, decreased concentration and motivation, and racing thoughts. (Tr. 303.) She also complained of chronic back, neck, and hip pain since her accident. (Tr. 300.)

On October 27, 2003, Centerstone therapist Pamela Williams reported that Plaintiff had an anxious affect, sad/anxious mood, and marked difficulties with interpersonal functioning and adaptation to change. (Tr. 309–10.) Ms. Williams also found Plaintiff had moderate restrictions in her daily activities, with a fairly limited ability to sustain concentration and continued flashbacks and memory issues related to the accident. (*Id.*) Plaintiff's next therapy appointment was cancelled by the therapist (Tr. 307), and Plaintiff did not attend her initial psychiatric appointment in November (Tr. 317–18), or her subsequent therapy appointment in December

5

2003. (Tr. 306.) Centerstone reported the termination of Plaintiff's care on February 2, 2004, and summarized that Plaintiff had reported symptoms of anxiety, was diagnosed with posttraumatic stress disorder and cannabis abuse, and was assigned a Global Assessment of Functioning[2] ("GAF") scoreof 55, indicating moderate psychological limitations. (Tr. 297–98.)

On June 2, 2004, Plaintiff returned to Centerstone for psychiatric treatment, reporting symptoms of depression, memory loss, and chronic pain. (Tr. 280–85.) On June 11, 2004, in her initial psychiatric evaluation, Dr. William J. Vanveen diagnosed Plaintiff with major depressive disorder with psychotic features and cannabis abuse, and assigned a GAF score of 40, indicating major impairment of functioning. (Tr. 294.) Plaintiff was prescribed the antidepressant Zoloft, but stopped taking it because it made her feel strange and took away her appetite. (Tr. 275, 277.) On June 18, 2004, a Centerstone therapist assessed that Plaintiff's interpersonal functioning as poor because she "isolates," her ability to adapt to change as poor because her depressive symptoms worsen with stress, and noted she had difficulty coping with chronic pain. (Tr. 274.)

### E. Testimony and Non-Medical Evidence

In her August 2001 Daily Activities Questionnaire (Tr. 84–91), Plaintiff indicated that she left home once or twice a week to go to the store—although her mother usually escorted her—she cooked as often as twice a week, and visited with friends or relatives once or twice a month. (Tr. 86–88.) Plaintiff reported that her neck, back, and spine caused her pain and that she "hurt every day all over." (Tr. 84, 90.)

---

[2] The Global Assessment of Functioning test is a subjective determination that represents the "clinician's judgment of the individual's overall level of functioning." *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 924 n. 1 (E.D. Mich. 2005) (*citing* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 1994)). The score ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain personal hygiene, or serious suicidal act with clear expectation of death). A GAF score of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

At the hearing before Administrative Law Judge ("ALJ") Peter C. Edison on June 21, 2004, Plaintiff and her mother testified that the accident had significantly impacted Plaintiff's ability to function. Plaintiff testified that since the accident, her concentration has been poor and she no longer cleans her house, makes her bed, or cooks meals. (Tr. 423–24, 426.) Additionally, Plaintiff stated that she has trouble sitting for long periods and that, although she mostly stays at home because of the pain and psychological impact of the accident, she is able to go to the store every two to three weeks. (Tr. 433, 435, 440.) Plaintiff's mother testified that since the accident, Plaintiff is "always sad. She's always depressed. She is always in pain. She has panic attacks and anxiety." (Tr. 445.)

## II. PROCEDURAL BACKGROUND

On June 26, 2001, Plaintiff filed her SSI application, alleging disability due to injuries from her accident, back pain, leg pain, and anxiety attacks. (Tr. 66–68, 75.) The Social Security Administration denied Plaintiff's application initially (Tr. 45–48) and upon reconsideration. (Tr. 51–52.) Plaintiff then filed a written request for a hearing before an ALJ. (Tr. 53.) ALJ Edison conducted the hearing on June 21, 2004, receiving testimony from Plaintiff, Plaintiff's mother, and an impartial vocational expert. (Tr. 418–54.) On September 9, 2004, ALJ Edison issued an unfavorable decision to Plaintiff, finding that she was not disabled under the meaning of the Social Security Act. (Tr. 16–26.) Specifically, ALJ Edison made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

2. The claimant's status post fractures of lower limb, fractures of bones, and anxiety disorder are considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5. The claimant retains the residual functional capacity to perform the exertional demands of light work with a sit/stand option not requiring a significant amount of memory or concentration.

6. The claimant has no past relevant work (20 CFR § 416.965).

7. The claimant is a 'younger individual' (20 CFR § 416.963).

8. The claimant has 'a limited education' (20 CFR § 416.964).

9. The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

10. Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as a small product packer, general clerk, marker, storage attendant, and table worker.

11. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(Tr. 25.)

On November 4, 2012, Plaintiff sought review of ALJ Edison's decision from the

Appeals Council. (Tr. 10–12.) On October 23, 2006, the SSA's Appeals Council declined to

review the case (Tr. 6–8), thereby rendering the decision of ALJ Edison the final decision of the Commissioner.

Plaintiff filed this action on February 14, 2007, to obtain judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). (Doc. No. 1.) Pursuant to Magistrate Judge Bryant's order of April 3, 2007 (Doc. No. 13), Plaintiff filed a Motion for Judgment on the Record with a Memorandum in Support on May 29, 2007. (Doc Nos. 17; 18.) The Commissioner filed a Response on June 27, 2007. (Doc. No. 19.) Plaintiff filed a Reply Brief on July 17, 2007. (Doc. No. 20.) Magistrate Judge Bryant issued his Report and Recommendation on October 7, 2008, recommending that Plaintiff's Motion be denied. (Doc. No. 21.)

On November 12, 2008, with no objection from Plaintiff to Magistrate Judge Bryant's Report, the Court issued an order adopting the Report and denying Plaintiff's Motion for Judgment on the Administrative Record. (Doc. No. 22.) On November 20, 2008, Plaintiff filed a Motion to Alter or Amend Judgment and/or Motion for Relief from Judgment, alleging that Plaintiff's counsel had mistakenly missed the deadline to file an objection to the Report based on an oversight. (Doc. No. 24.) On May 28, 2013, the Court granted Plaintiff's Motion to Alter or Amend Judgment and set aside its November 12, 2008, order denying Plaintiff's Motion for Judgment on the Administrative Record. (Doc. No. 26.)

Pursuant to the May 28, 2013, order, Plaintiff filed an Objection to the Report, arguing that ALJ Edison's decision was not supported by substantial evidence. (Doc. No. 27.) Specifically, Plaintiff asserts that ALJ Edison erred (1) in concluding, based on the report of examining consultant Dr. Reed, that Plaintiff could perform light work; (2) by failing to give

9

proper consideration to the extent of Plaintiff's mental health impairments; and (3) in concluding

that there are no limitations in Plaintiff's daily activities or social functioning. (*Id.* at 4–8, 8 n.2.)

## III.   STANDARD OF REVIEW

The Court's review of the Report is *de novo*.  28 U.S.C. § 636(b) (2012).  However, this

review is limited to "a determination of whether substantial evidence exists in the record to

support the [Commissioner's] decision and to a review for any legal errors." *Landsaw v. Sec'y of*

*Health & Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Title II of the Social Security Act

provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported

by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g) (2012). Accordingly, if the

Commissioner adopts the ALJ's decision, the reviewing court will uphold the decision if it is

supported by substantial evidence. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Substantial evidence is a term of art and is defined as "such relevant evidence as a reasonable

mind might accept as adequate to support the conclusion." *Richardson v. Perales*, 402 U.S. 389,

401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is "more than a

mere scintilla of evidence, but less than a preponderance." *Bell v. Comm'r of Soc. Sec.*, 105 F.3d

244, 245 (6th Cir. 1996) (citing *Consol. Edison*, 305 U.S. at 229).

"Where substantial evidence supports the Secretary's determination, it is conclusive,

even if substantial evidence also supports the opposite conclusion." *Crum v. Sullivan*, 921 F.2d

642, 644 (6th Cir. 1990); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389 (6th Cir. 1999).

This standard of review is consistent with the well-settled rule that the reviewing court in a

disability hearing appeal is not to weigh the evidence or make credibility determinations, because

these factual determinations are left to the ALJ and to the Commissioner. *Hogg v. Sullivan*, 987

F.2d 328, 331 (6th Cir. 1993); *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992). Thus, even if the Court would have come to different factual conclusions as to the Plaintiff's claim on the merits than those of the ALJ, the Commissioner's findings must be affirmed if they are supported by substantial evidence. *Hogg*, 987 F.2d at 331.

## IV. ADMINISTRATIVE HEARING PROCEEDINGS AND ALJ EDISON'S DECISION

To be eligible for SSI, a claimant has the ultimate burden to establish he or she is entitled to benefits by proving his or her

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A) (2012). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

1. If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

2. If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

3. If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[3] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

4. If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity ("RFC") (e.g., what the claimant can still do despite his or

---

[3] The Listing of Impairments is found at 20 C.F.R. Part 404(P), App. 1 (2014).

her limitations); if the claimant has the RFC to do his or her past relevant work, the claimant is not disabled. If the claimant is not able to do any past relevant work or does not have any past relevant work, the analysis proceeds to step five.

5. At the last step it must be determined whether the claimant is able to do any other work. At this step, the Commissioner must provide evidence of the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and RFC.

20 C.F.R. § 416.920(a) (2014); *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

If, at step five, if the ALJ finds that the claimant cannot perform past relevant work or does not have past relevant work, he or she must consider whether the claimant can perform other work, by considering characteristics such as the claimant's RFC, age, education, and work experience. 20 C.F.R. § 416.920(g)(1); *Moon*, 923 F.2d at 1181.

Here, ALJ Edison found under the five-step analysis that (1) Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability; (2) Plaintiff's condition, due to her suffering after multiple fractures and her anxiety disorder, is considered "severe"; (3) Plaintiff did not have an impairment that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,.App. 1; (4) Plaintiff had no past relevant work; and (5) considering Plaintiff's age, experience, and education, Plaintiff has the RFC to perform light work with a sit/stand option not requiring a significant amount of memory or concentration, and significant numbers of jobs exist in the national economy that Plaintiff can perform. (Tr. 25.) ALJ Edison concluded that Plaintiff has not been under a disability at any time through the date of his decision. (*Id.*)

12

## V. OBJECTIONS

Plaintiff raises three objections to Magistrate Judge Bryant's Report. (Doc. No. 27.) Her main objection is that Judge Bryant incorrectly concluded that ALJ Edison's finding that Plaintiff was able to perform light work was based on substantial evidence in the record. (*Id.* at 4–8.) Plaintiff also reasserts her initial objections to ALJ Edison's decision, as laid out in her Memorandum in Support for Judgment on the Administrative Record (Doc. No. 18) and Reply Brief (Doc. No. 20), that ALJ Edison erred (1) by failing to give proper consideration to the extent of Plaintiff's mental health impairments, and (2) in concluding that there are no limitations in Plaintiff's daily activities or social functioning. (Doc. No. 27 at 8 n.2.) The court addresses each objection in turn.

### A. ALJ's Conclusion that Plaintiff Could Perform Light Work Based on Dr. Reed's Report

Plaintiff asserts that ALJ Edison's finding that she could perform light work was not based on substantial evidence. (*Id.* at 4.) Specifically, Plaintiff claims that ALJ Edison misinterpreted consulting physician Dr. Reed's report in concluding that Plaintiff "retains the residual functional capacity to perform the exertional demands of light work with a sit/stand option." (*Id.* at 4–6; *see* Tr. 23.) In his report, Dr. Reed concluded that Plaintiff was able "to do light duty specifically working one-third to two-thirds of the day with frequent breaks and lifting no more than 20 pounds." (Tr. 145.) The record contains assessments of Plaintiff's ability to engage in work-related physical exertion by two additional non-examining state agency consultants conducted in October 2001 and May 2002. (Tr. 147–52; 235–42.) Both non-examining consultants concluded that Plaintiff was able to perform medium work, but neither

13

indicated that she would require periodic alternation between sitting and standing or frequent breaks. (Tr. 148, 236; *See* 20 C.F.R. 404.1567(c) (2014))

In concluding that Plaintiff was able to perform light work, ALJ Edison states that he gave "more weight to the assessment of Dr. Reed who performed a consultative examination," rather than rely on the non-examining physicians' report, "who concluded that the claimant retained the functional capacity to perform the exertional demands of moderate work activity." (Tr. 23.) Plaintiff points out that Dr. Reed's report does not state that Plaintiff was able to meet the exertional demands of light work, as defined by 20 C.F.R. § 416.967, but states that she would be able to do "light duty" work for less than two-thirds of the day with frequent breaks. (Doc. No. 27 at 4.) Plaintiff argues that ALJ Edison could not both rely on Dr. Reed's report and conclude that Plaintiff retains the RFC to perform a significant range of light work, as ALJ Edison found that Plaintiff's impairments were more severe. (Doc. No. 27 at 4–8.) Plaintiff argues that this finding is therefore not supported by substantial evidence. (*Id.*) Magistrate Judge Bryant found that ALJ Edison relied on Dr. Reed's report in regard to Plaintiff's ability to lift no more than twenty pounds, properly weighing the competing assessments of Plaintiff's work-related physical exertion ability. (Doc. No. 21 at 18.) In finding that Plaintiff was able to perform "light work" as defined by 20 C.F.R. § 416.967, ALJ Edison was not adopting Dr. Reed's conclusions "wholesale", but relying on his assessment of her lifting limitations. (*Id.* at 18–19.) In her Objection to the Report, Plaintiff responds that ALJ Edison did not *explicitly* accept Dr. Reed's conclusions only in regard to her ability to lift, stating only that he "gives more weight to the assessment of Dr. Reed." (Doc. No. 27 at 6–7.) Plaintiff argues that if it were ALJ Edison's intention to only accept Dr. Reed's conclusions regarding her lifting limitations, he would have so stated. (*Id.*)

14

Federal regulations require the ALJ to evaluate every medical opinion in the record before coming to a decision. 20 C.F.R. § 416.927(c) (2014). Under 20 C.F.R. § 416.927(c), while considering all opinions, the ALJ should give controlling weight to treating[4] physicians' opinions that are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotation marks omitted). Even if a treating physician's opinion is not controlling, more weight should be given to treating sources, because those opinions provide a more "detailed, longitudinal picture" of a claimant's condition than reports from individual examinations, such as consultative examinations. § 416.927(c)(2); *Wilson*, 378 F.3d at 544. Regulations require the ALJ to "always give good reasons in [the] notice of determination or decision for the weight" given to the opinion of a claimant's treating physician, which courts refer to as the "reason-giving requirement." § 416.927(c)(2); *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406–07 (6th Cir. 2009). The opinion of a non-treating, consulting physician is not entitled to the same deference given to the opinion of a treating physician. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Court finds that ALJ Edison's conclusion that Plaintiff retains the RFC to perform light work was supported by substantial evidence. ALJ Edison based his determination on the following considerations: (1) his determination that Plaintiff "sustained severe injuries on September 20, 1997, but . . . recovered from those injuries well within twelve months,"; and (2)

---

[4] A "treating source" is defined in the relevant federal regulation as "[a claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 416.902 (2014). A medical source will not be considered a "treating source" if the "relationship with the source is not based on [the claimant's] medical need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of [the claimant's] claim for disability. *Id.*

the opinion of Dr. John R. Edwards, Plaintiff's orthopedic surgeon at Vanderbilt Hospital. (Tr. 23.) With regard to the second point, ALJ Edison found "no objective evidence of record to support [Plaintiff's] allegations of disabling [sic] since March 26, 1998" (*id.*), the same date that Dr. Edwards recommended Plaintiff could "discontinue all assist[ive] devices and seek gainful employment should she so desire" (Tr. 319). As Dr. Edwards had an ongoing treatment relationship with Plaintiff—seeing her multiple times during her four-month post-accident rehabilitation, (Tr. 319–27) and performing two of Plaintiff's orthopedic surgeries following the accident (Tr. 364–65; 377–78)—he is considered a "treating source" under 20 C.F.R. § 416.902. Dr. Reed, on the other hand, whose relationship with Plaintiff was based solely on her need to obtain a report in support of her disability, is considered a non-treating, consulting source under the regulation. § 416.902. Since more weight is to be given to treating sources under § 416.902, the Court finds ALJ Edison properly relied on Dr. Edwards' opinion in ruling that Plaintiff retained the RFC to perform light work. *See also Wilson*, 378 F.3d at 544.

Dr. Edwards did not express an opinion as to Plaintiff's lifting limitations. (Tr. 319.) Accordingly, ALJ Edison relied on Dr. Reed's report in determining that Plaintiff could perform light work rather than medium work. (Tr. 23.) He noted that although the non-examining physicians concluded that Plaintiff would be able to "perform the exertional demands of moderate work activity," he would give more weight to the examining consultative physician's conclusion in regard to Plaintiff's lifting limitations. (Tr. 23.) However, ALJ Edison was not required to adopt Dr. Reed's conclusions in their entirety merely because he afforded more weight to Dr. Reed's report in assessing her exertional limitations.

Similarly, ALJ Edison was not required to specifically state that he was "only accepting Dr. Reed's assessment as it related to [Plaintiff's] capacity to lift," as Plaintiff suggests. (Doc

No. 27 at 6.) Because Dr. Reed is a non-treating, consulting physician, and not a treating physician, the reason-giving requirement of 20 C.F.R. § 416.927(c)(2) does not apply to the weight the ALJ gives his opinions. Thus, ALJ Edison was not required to explain the weight given to Dr. Reed's assessment.

Accordingly, the Court finds ALJ Edison's determination that Plaintiff retains the RFC to perform a significant range of light work was based on substantial evidence. Although ALJ Edison deferred to Dr. Reed's report in determining Plaintiff's ability to engage in physical exertion, he made clear that Dr. Reed's assessment was not "the primary evidentiary pillar" of his finding. (Doc. No. 18 at 12.)

### B. ALJ's Evaluation of Plaintiff's Mental Health Condition

ALJ Edison found that Plaintiff's mental impairments only required restrictions on significant concentration or memory. (Tr. 23.) Plaintiff asserts that ALJ Edison erred in failing to properly consider the impact of Plaintiff's mental health impairments on her ability to work. Plaintiff did not re-visit this argument in her Objection to the Report, but preserves her objections from her Memorandum in Support of her Motion for Judgment (Doc. No. 18) and Reply Brief (Doc. No. 20). (Doc. No. 27 at 8 n.2.)

Plaintiff asserts that ALJ Edison improperly discounted reports of her mental impairments as simply "document[ing] the claimant's alleged symptoms." (Doc. No. 18 at 15 (citing Tr. 22.)) In her Memorandum, Plaintiff points to sections of the record that demonstrate the impact of her mental impairments on her ability to work: her expression of frustration at the lack of progress in her mental health treatment, discontinuing treatment, then returning to counseling to "provide [her son] with a normal life" (Tr. 278, 297, 439–441); her adverse reaction to the psychotropic medication she was prescribed (Tr. 277); notes from Centerstone

17

which describe her anxious affect/mood, panic attacks, isolation, and a diagnosis of severe major depressive disorder with limitations in interpersonal functioning ability and ability to adapt to change and moderate restrictions in daily activities (Tr. 274–318); reports of panic attacks following her automobile accident in 1997 (Tr. 321); reports of panic attacks and anxiety in her psychological assessment by Dr. Doineau in 2002 (Tr. 219–20); descriptions of anxiety attacks in her Disability Report and Activities of Daily Living Questionnaire (Tr. 75, 90); and testimony of anxiety attacks by Plaintiff and her mother (Tr. 440–41; 447). (Doc. No. 18 at 13–16.)

Plaintiff argues that in their evaluations, the mental health professionals are not simply describing Plaintiff's symptoms, as the ALJ suggests (Tr. 22), but "are analyzing both the interview and how Ms. Braden presented herself" as they made assessments and developed a treatment plan. (Doc. No. 18 at 15.) Because mental health treatment is designed to respond to a patient's symptoms as described, the evaluations of Plaintiff's mental health in the record should not be dismissed simply because the reports lack objectivity. (*Id.*) Additionally, Plaintiff argues that ALJ Edison should not have dismissed her and her mother's testimony regarding Plaintiff's mental impairments as incredible because "the description of her emotional problems has been consistent since she left Vanderbilt Hospital and is not contrary to the psychological record." (*Id.*)

With regard to a claimant's subjective complaints, under 42 U.S.C. § 423(d)(5)(A):

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged.

(2012); *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 230 (6th Cir. 1990).

When considering a claimant's statements regarding symptoms, the ALJ follows a two-factor

test. First, the ALJ determines if there is objective medical evidence of a physical or mental

impairment. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (internal

citations omitted); *see also* 20 C.F.R. § 416.929 (2014). If such evidence exists, the ALJ next

determines whether there is objective medical evidence to confirm the severity of the alleged

symptoms arising from the impairment, or whether the impairment is of such severity that it

could reasonably be expected to produce the alleged symptoms. *Walters*, 127 F.3d at 531; *see*

*also* 20 C.F.R. § 416.929. Generally, mental impairments cannot be objectively verified in the

same manner as physical illnesses, so a psychiatrist report should not be rejected simply because

of its imprecision or absence of substantial documentation. *Blakenship v. Bowen*, 874 F.2d 1116,

1121 (6th Cir. 1989) (citing *Poulin v. Bowen*, 817 F.2d 865, 873–74 (D.C. Cir. 1987)).

When, under the second factor, a claimant's statements about his or her symptoms are not

substantiated by objective medical evidence, the ALJ may assess the claimant's credibility to

determine validity of the statements. *Walters*, 127 F.3d at 531 (citing *Kirk v. Sec'y of Health &*

*Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981)). While subjective testimony must be

considered, an ALJ may make an adverse credibility finding based on other evidence of record.

*Townsend v. Sec'y of Health & Human Servs.*, 762 F.2d 40, 44 (6th Cir. 1985). Further, an

ALJ's finding regarding the credibility of a claimant's testimony is entitled to great deference

because the ALJ observes the claimant's demeanor and credibility directly. *Walters*, 127 F.3d at

531; *Blacha*, 927 F.2d at 230. Additionally, if there are "demonstrable discrepancies" between a

plaintiff's testimony and other portions of the record, the court should be "particularly reluctant"

to set aside an ALJ's credibility finding. *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).

The Court finds ALJ Edison's decision regarding Plaintiff's mental impairments is supported by substantial evidence. ALJ Edison concluded that Plaintiff's "statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the degree of medical treatment required after March 1998, and the findings made on examination for both her physical and mental complaints." (Tr. 23.) Although ALJ Edison notes that Centerstone's records "primarily document the claimant's alleged symptoms," this was not his sole reason for finding that Plaintiff's testimony was not credible.

Preceding his conclusion, ALJ Edison noted several aspects of the record which were not consistent with Plaintiff's alleged mental impairments: (1) Dr. Doineau's assessment which questioned Plaintiff's "purposeful evasiveness when responding to questions" and explained that Plaintiff had never been admitted to a psychiatric hospital or been to the emergency room due to her panic attacks, that she was oriented, her memory seemed intact, and that there was no evidence of psychosis or delusional thinking (Tr. 21); (2) Plaintiff's admission that she saw a counselor several times following her accident, but dropped out of treatment (Tr. 22); and (3) the fact that although she had recently been seen at Centerstone, their records primarily focus on Plaintiff's complaints rather than assessments. (Tr. 22.) Thus, ALJ Edison discredited Plaintiff's statements concerning her mental health impairments for reasons beyond his distrust of Centerstone's evaluations, and he sufficiently enumerated those reasons. As such, the Court holds ALJ Edison's determination regarding Plaintiff's mental health limitations was based on substantial evidence.

### C. ALJ's Finding that There Are No Limitations in Plaintiff's Daily Activities and Social Functioning

Finally, Plaintiff claims that ALJ Edison erred in concluding that there are no limitations in Plaintiff's daily activities or social functioning. Like her second objection, Plaintiff did not restate her argument in her Objection. (Doc. No. 27 at 8 n.2.)

Plaintiff asserts that her testimony that she is limited in her daily activities and social functioning is consistent with the record as a whole. (Doc. No. 18 at 18–19.) As indicated in her hearing testimony and 2001 Activities of Daily Living Questionnaire, when she goes to the store, her mother usually takes her (Tr. 86); although she goes outside her home once or twice a week, she mostly stays home (Tr. 86, 424); she only cooks a couple times a week at most (Tr. 86–87); her mother helps her clean her apartment (Tr. 447); and she only visits with friends once or twice a month (Tr. 88). Thus, Plaintiff argues, when ALJ Edison concluded that Plaintiff has no limitations in activities of daily living or social functioning, he lifted "pieces out of the record without mentioning the qualifiers and the entire context of the testimony." (Doc. No. 18 at 19; Doc. No. 20 at 7.)

As previously noted, the ALJ may assess the claimant's credibility to determine validity of the statements, and an ALJ's finding regarding the credibility of a claimant's testimony is entitled to great deference. *Blacha*, 927 F.2d at 230.

Here, ALJ Edison provided summaries of the evidence before determining that Plaintiff's statements regarding her impairments were not credible. According to the record, she "goes to the store and mall, drives, prepares meals for herself and her son, does household chores when she is feeling good, and is the primary caretaker of her son" and "gets along okay with others . . . has a boyfriend and one friend, she visits with friends and relatives and goes out to eat with her

boyfriend." (Tr. 18.) Although Plaintiff had testified that she does not clean her house, make her bed, or cook, but drives her son to daycare and goes to the store every week or so, during Dr. Doineau's evaluation, Plaintiff reported "that she washes dishes, straightens her room, cleans the bathroom and prepares meals." (Tr. 22.)

Given these discrepancies, the Court finds that ALJ Edison's credibility determination has a sufficient evidentiary basis in the record, and his decision to deny benefits is supported by substantial evidence.

## VI.  CONCLUSION

The Court finds substantial evidence in the record supported the ALJ's decision and therefore, **ADOPTS** the Report (Doc. No. 21) in its entirety.  Plaintiff's Motion (Doc. No. 17) is **DENIED** and decision of the Commissioner is **AFFIRMED**.  The case is hereby **DISMISSED**. The Clerk of the Court is **DIRECTED** to close the case.

It is so ORDERED.

Entered this the _____ day of June 2014.

_____
JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT